**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| BRYAN KIMBERLY HEDDEN, and | ) | |
| CYNTHIA HEDDEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01986-TWP-TAB |
| | ) | |
| CBS CORPORATION, CRANE CO., | ) | |
| CROWN CORK & SEAL COMPANY, INC., | ) | |
| GARDNER DENVER INC., GENERAL | ) | |
| ELECTRIC COMPANY, JOHN CRANE, | ) | |
| INC., LINK-BELT CONSTRUCTION | ) | |
| EQUIPMENT CO. LTD, RILEY POWER, | ) | |
| INC., and SPX CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on multiple Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Crown Cork & Seal Company, Inc. (Filing No. 174), CBS Corporation (Filing No. 179), General Electric Company (Filing No. 180), Crane Co. (Filing No. 181), Gardner Denver, Inc. (Filing No. 196), John Crane, Inc. (Filing No. 198), Link-Belt Construction Equipment Company (Filing No. 200), and Riley Power, Inc. (Filing No. 202). Following many years of employment with Louisville Gas & Electric and approximately a year and a half of active duty service in the United States Navy, Plaintiff Bryan Kimberly Hedden ("Mr. Hedden") developed malignant pleural mesothelioma. Mr. Hedden asserts that he developed mesothelioma as a result of being exposed to asbestos during his time with the Navy and while employed by Louisville Gas & Electric.  He filed this tort action against various manufacturers, distributors, contractors, and miners.  Mr. Hedden has since resolved his dispute with many of the

Defendants.  Many other Defendants moved for summary judgment on various grounds.  The Court will address each of the Motions for Summary Judgment in turn.

## I. BACKGROUND

Mr. Hedden graduated from high school in 1967.  Before graduating, he enlisted in the United States Navy Reserves.  He began active duty service in the Navy in April 1968 and was assigned to the USS Franklin D. Roosevelt (the "Roosevelt"), one of the Navy's aircraft carriers, in May 1968 in Mayport, Florida.  Mr. Hedden was a yeoman, Petty Officer Third Class, and was responsible for clerical and paper work and maintaining records.  He traveled throughout the ship and worked around all of the equipment on the ship.  Mr. Hedden's office was in the berthing deck right above the engine, fire, and boiler rooms.  His sleeping compartment was right above and next to the engine rooms.  While his job responsibilities did not require him to personally work on any equipment, he did work in close proximity to equipment on the Roosevelt in order to complete his duties.

After Mr. Hedden boarded the Roosevelt in Mayport in May 1968, the Roosevelt remained in Mayport for about a month to undergo routine maintenance, including pump, valve, evaporator, and blower work.  The valve work included repairing and replacing asbestos-containing packing.  The Roosevelt had twelve boiler rooms, and Mr. Hedden visited them many times during that month.  The work going on in these areas exposed Mr. Hedden to asbestos.

The Roosevelt then travelled to the Norfolk Shipyard in Portsmouth, Virginia for a major overhaul, which lasted approximately thirteen months.  During this overhaul, nearly every piece of equipment on the ship was touched, worked on, repaired, and maintained.  The main engine, the boilers, the turbines, the other equipment, and the berthing compartments were overhauled or rebuilt.  All of the ship's pumps, blowers, and turbines, and many of the ship's pipes and valves

were rebuilt. The ship's decks and some of the walls were removed, including those of Mr. Hedden's office, which left it open to the engine rooms and turbines below. In 1968, when this work was performed, there was no dust collection system was in place.

While Mr. Hedden did not personally repair, rebuild, or overhaul any of the equipment, he worked in the vicinity of others while they performed this work. Many of the pieces of equipment utilized asbestos-containing gaskets, insulation, or packing. Work on this equipment and the asbestos-containing parts created dust which Mr. Hedden breathed. Mr. Hedden's duties took him by and through the engine rooms on a regular basis. The work on the turbines located in the engine rooms included taking the turbines apart and checking all of the blades, veins, and housing. This required the turbines' asbestos insulation to be removed and disturbed, and Mr. Hedden was in the immediate vicinity when such work was performed. He spent approximately one or two months eating and sleeping in a barracks while the berthing compartments, gully, and mess decks were redone, but the rest of his time was served on board the ship.

The Roosevelt's major overhaul was completed in approximately December 1969. During the return trip to Mayport, the ship underwent a "shakedown," during which all of its equipment was tested at maximum capacity to ensure it was seaworthy and battle-ready. The equipment was fired-up and pushed to the limit so that necessary adjustments could be determined and made. The adjustments were made, which included adding asbestos insulation during the return trip to Mayport. Mr. Hedden was around this work when it was being performed. Upon return to Mayport, Mr. Hedden was released from active duty on New Year's Eve, 1969, shortly before the Roosevelt shipped out for the Mediterranean.

After leaving active duty with the Navy, Mr. Hedden returned to work at Louisville Gas & Electric. He previously had worked at Louisville Gas & Electric for about five months prior to his

service in the Navy.  From December 1967 through April 1968, he had worked as a mechanic's helper, serving as an apprentice performing millwright and mechanical work on pumps, compressors, and valves.  Mr. Hedden worked on piping for some major pieces of equipment, which involved extensive insulation work including wrapping joints with heat-proof wrapping. He also worked on blowers and valve indicators during this time.

In January 1970, Mr. Hedden returned to Louisville Gas & Electric and worked again as a mechanic's helper.  He also worked as an insulator's helper.  He put metal lagging on pipes and worked around the soot boiler piping, turbine, and steam chest.  He also performed maintenance services as needed.  Mr. Hedden became a second-class insulator/pipe cutter and then a first-class insulator/pipe fitter.  This work required him to repair, replace, remove, and install asbestos insulation.  He also provided support at various Louisville Gas & Electric facilities throughout Kentucky, performing construction and insulation work.  Around 1979, Mr. Hedden was promoted to be a "pusher," essentially a foreman's assistant, and then a year or two later he was promoted to be a foreman.  As a foreman, Mr. Hedden performed progressively less hands-on work with insulation and equipment.  Around 1988, Mr. Hedden became an "A" mechanic at the Trimble County powerhouse.  In the late 1990s, he became a service leader and ceased performing hands-on work.  Mr. Hedden retired in April 2001 but was later rehired by Louisville Gas & Electric as a contract coordinator, performing no hands-on work.  He retired again in January 2014.

During Mr. Hedden's earlier years with Louisville Gas & Electric, the company conducted turbine "turnarounds," essentially a turbine overhaul, approximately two to four times a year between 1970 and 1985.  Each turnaround lasted approximately six weeks.  The turbines required insulation to function otherwise they would burn up within a few minutes.  Mr. Hedden and other insulators removed the insulation during turnarounds.  The turbine manufacturers specified the

type of insulation to be used. Many of Louisville Gas & Electric's turbines used asbestos-containing block insulation, mud/asbestos-cement, and blankets. The removal of this asbestos insulation caused visible dust to circulate in the air that Mr. Hedden breathed.

After removing a turbine's asbestos insulation, Mr. Hedden often continued working in the vicinity while internal turbine maintenance took place. Such work included disturbing asbestos-containing gaskets and packing. He also was close by when asbestos wedges were installed in turbines to help maintain the tightness of the rotor windings. This required sanding the wedges to make them fit tightly, a process which created visible dust. Once the turbine work was completed, Mr. Hedden re-insulated the turbines with asbestos-containing insulation, again creating visible asbestos dust that Mr. Hedden breathed. Later in Mr. Hedden's career, Louisville Gas & Electric tested the insulation and confirmed that it was asbestos. Louisville Gas & Electric followed the specifications of its equipment's manufacturers when performing work.

Throughout his time with Louisville Gas & Electric in his various capacities as a mechanic's helper, insulator helper, insulator, pusher, and foreman, Mr. Hedden worked in or on the coal mills, hot air ducts, various steam piping systems, blow-down stations, turbines, turbine steam chests, control valves, intercept valves, pumps, and water piping. Many times, this equipment was shipped with the asbestos-containing parts or insulation, which the manufacturer specified should be used. He was regularly exposed to various asbestos-containing products during the course of his employment at Louisville Gas & Electric.

Mr. Hedden was never warned about the hazards of asbestos until the late 1970s or early 1980s, and even then, he was provided insufficient workplace safeguards to protect him from exposure. It was not until about the 1990s that more appropriate safeguards were implemented.

Asbestos can cause a variety of both non-malignant and malignant diseases when inhaled or ingested (Filing No. 271-6).  Asbestosis is a non-malignant disease caused by scar tissue forming in the gas exchange regions of the lung.  *Id.*  Pleural fibrosis is another non-malignant disease caused by scar tissue forming in the sub-mesothelial connective tissue around the lungs and abdominal organs.  *Id.*  Lung cancer is a malignant tumor, which forms in the lung typically around a conducting airway.  *Id.*  Mesothelioma is a malignant tumor resulting from the uncontrolled growth of cells in a mesothelial lining such as the pleura or peritoneum. Mesothelioma has a long latency period and may take ten to fifty years between the first exposure to asbestos and a diagnosis of mesothelioma.  *Id.*

Unfortunately, in June 1985, Mr. Hedden was informed that he had been diagnosed with asbestosis. Mr. Hedden then filed a complaint in state court in 1986 against numerous defendants, none of which are defendants in this case.  Mr. Hedden alleged that, as a result of working with asbestos products while employed by Louisville Gas & Electric, he contracted "diseases and injuries to his body system, lungs, and respiratory disorders, and the risk of mesothelioma and other cancers and injuries causing him pain, suffering and mental anguish." (Filing No. 204-1 at 23.)

Approximately twenty-seven years later, on August 16, 2013, Mr. Hedden was diagnosed with malignant pleural mesothelioma, resulting from his exposure to asbestos.  After his diagnosis, Mr. Hedden had the pleural lining of his right lung removed and underwent chemotherapy. However, these treatments only manage and slow down the mesothelioma because there is no known cure for mesothelioma.  On November 6, 2013, Mr. and Mrs. Hedden initiated this lawsuit, asserting claims based on Mr. Hedden's mesothelioma.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III. DISCUSSION

This case presents questions regarding choice-of-law, the application of maritime law, and the application of either the "one-disease" or "two-disease" rule.  The Court will first address these issues and then turn to the Defendants' Motions for Summary Judgment.

### A.    Application of Maritime Law

The Heddens assert that maritime law applies to their claim for damages arising out of Mr. Hedden's exposure to asbestos during his Navy service.  The Defendants assert that the evidence does not support the application of maritime law to any of Mr. Hedden's injuries.  Maritime law applies to claims involving a plaintiff who was a sea-based Navy worker where the allegedly defective product was produced for use on a vessel as long as the plaintiff can meet the test set out in the *Sisson* and *Grubart* cases.  *Conner v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455, 465–66 (E.D. Pa. 2011).

In *Grubart*, the Supreme Court explained that a court has admiralty jurisdiction and will apply maritime law in a tort action if the claims "satisfy conditions both of location and of connection with maritime activity."  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

> A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.  The connection test raises two issues.  A court, first, must assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce.  Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Id.* at 534 (citations and quotation marks omitted).

In this case, the location test is satisfied because Mr. Hedden's alleged exposure to asbestos occurred while he was on board the Roosevelt when it was docked in navigable water in Mayport,

Florida and when it was being overhauled in the port (and also in dry dock) at the Norfolk Shipyard in Portsmouth, Virginia.  Some of the alleged exposure occurred in navigable water during the return trip to Mayport, Florida.

Concerning the connection test, the incident—asbestos exposure on the Roosevelt—could potentially disrupt maritime commerce by rendering the ship too hazardous to operate.  "Unsafe working conditions aboard a vessel have consistently been held to pose a potentially disruptive impact upon maritime commerce.  *See, e.g.*, *Alderman v. Pacific Northern Victor, Inc.*, 95 F.3d 1061, 1064 (11th Cir. 1996)."  *Lambert v. Babcock & Wilcox, Co.*, 70 F. Supp. 2d 877, 884 (S.D. Ind. 1999).  "Moreover, asbestos-related illness could afflict other members of the crew, causing a labor shortage." *Id.*  The general character of the activity giving rise to the incident—routine maintenance of the Roosevelt, the ship overhaul, and testing—has a substantial relationship to traditional maritime activity.  Maintaining and testing the ship's main engine, boilers, turbines, pumps, valves, pipes, blowers, and other equipment is vital to the operation of the ship and is a substantial part of the ship's ability to conduct traditional maritime activity.

Having determined that the location and connection tests are satisfied in this case, the Court holds that maritime law applies to the Heddens' claim for damages arising out of Mr. Hedden's exposure to asbestos during his Navy service on the Roosevelt.

**B.    <u>Choice-of-Law Considerations</u>**

In determining what choice-of-law provisions to follow, when a case is removed to federal court based on diversity jurisdiction, the district court applies the forum state's choice-of-law rules to determine the applicable law.  *Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 791 (7th Cir. 2013); *Carlisle v. Deere & Co.*, 576 F.3d 649, 653 (7th Cir. 2009).  Although this case was removed pursuant to the Federal Officer Removal Statute and not based on diversity jurisdiction, the parties

agree that Indiana choice-of-law provisions govern in this matter.  Therefore, the Court will follow Indiana choice-of-law provisions to determine which states' laws apply.

The Heddens assert that Kentucky substantive law applies to their non-maritime claims. Defendants CBS Corporation, General Electric Company, and Link-Belt Construction Equipment Company agree with the Heddens that Kentucky substantive law applies.  However, Defendants Crane Co., Gardner Denver, Inc., and John Crane Inc. assert that Indiana substantive law applies to the Heddens' claims.  The parties point to differences in Kentucky's and Indiana's statutes of repose, which would affect the outcome of the case, thereby necessitating a choice-of-law analysis.

To help determine what states' laws apply, the Indiana Supreme Court adopted a two-step choice-of-law analysis in *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071 (Ind. 1987).  If the place of the tort has extensive connection with the legal action, the traditional rule of *lex loci delecti* ("the law of the place of the wrong") applies, in other words, the state where the last event necessary to make an actor liable for the alleged wrong takes place.  However, if the place of the tort bears little connection to the legal action, the court may consider other factors such as:  (1) the place where the conduct causing the injury occurred; (2) the residence or place of business of the parties; and (3) the place where the relationship is centered.  *Id.* at 1073–74.  The Indiana Supreme Court noted that "[t]hese factors should be evaluated according to their relative importance to the particular issues being litigated."  *Id.* at 1074.

The Defendants who urge the application of Indiana law focus on the first step of the test— the state where the last event necessary to make an actor liable for the alleged wrong takes place. They assert that Mr. Hedden's diagnosis of mesothelioma is the last event necessary to make any of the Defendants liable, his diagnosis occurred in Indiana, and, therefore, Indiana law should

apply.  Some of these Defendants also point to the fact that the Heddens are lifelong Indiana residents.

On the other hand, the Heddens and the Defendants who urge the application of Kentucky law explain that the simple act of diagnosing mesothelioma bears little connection to the legal action.  Thus, they argue, this Court should consider the additional factors to determine that Kentucky law is the appropriate law to apply.  They explain that Mr. Hedden's exposure to asbestos occurred over a thirty-year period while working in Kentucky.  It was his exposure to asbestos that led to his mesothelioma.  He was employed by a Kentucky company during his exposure.  His work took him to various facilities throughout Kentucky.  The Court agrees with this analysis and the conclusion that it is appropriate to apply Kentucky substantive law.  Therefore, the Court applies Kentucky substantive law to the Heddens' non-maritime claims.

**C.**   **One-Disease v. Two-Disease Rule**

The "one-disease" rule is based on the equitable rule against splitting of causes of action and requires a party to assert all causes of action which may arise from a single transaction in a single lawsuit rather than proceeding piecemeal in multiple actions. *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 193–95 (Ky. 1994).  Therefore, "suits for asbestos-related claims [] may be brought only once and may encompass all current or future damages, because a claim made early can take into account damages which may occur in the future." *Carroll v. Owens Fiberglas Corp.*, 37 S.W.3d 699, 701 (Ky. 2000).

Under the "two-disease" rule, "a person who brings an action based on a diagnosis of a non-malignant asbestos-related condition may bring a subsequent action upon a later diagnosis of a distinct malignant asbestos-related condition. The diagnosis of a malignant asbestos-related condition creates a new cause of action." *Sopha v. Owens-Corning Fiberglas Corp.*, 601 N.W.2d

627, 630 (Wis. 1999).  Thus, a single transaction of a series of exposures to asbestos that results in multiple asbestos-related diseases may lead to multiple lawsuits based on multiple diagnoses.

The Court first addresses whether the one-disease or two-disease rule is procedural or substantive. The Court addresses this issue because the Heddens have explained that Indiana procedural rules apply in this case.  They claim that the one-disease or two-disease rule is procedural and then explain that Indiana applies the two-disease rule.  The Heddens argue that, because the rule is procedural and Indiana uses the two-disease rule, their claims survive these summary judgment motions.  Indeed, the Heddens have conceded that,

> In the context of this matter, the Heddens' claims based upon Kim's mesothelioma would be barred in a one-disease jurisdiction because of his 1985 asbestosis diagnosis, while in a two-disease jurisdiction Kim's asbestosis and mesothelioma claims would each have their own, independent statute of limitations, and the Heddens' mesothelioma claims would be timely because they were filed less than one year after Kim's mesothelioma diagnosis.

(Filing No. 270 at 24.)

Substantive law is "[t]he part of the law that creates, defines, and regulates the rights, duties, and powers of parties." Black's Law Dictionary (10th ed. 2014).  Procedural law is "[t]he rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties themselves." *Id.*

While the Heddens assert that the one-disease or two-disease rule is procedural, the Defendants explain that it is substantive.  The Heddens equate this rule to a statute of limitations, which courts have determined is procedural, and indeed, the Heddens call it a two-disease statute of limitations.  The Heddens explain that the one-disease or two-disease rule operates as a time-bar to filing a cause of action and should thus be treated as a procedural rule.

The Defendants counter the Heddens' argument by explaining that, while the one-disease or two-disease rule may relate to statutes of limitations and the "date of discovery" rule, the one-

disease or two-disease rule truly is a substantive law because it defines the parties' rights and obligations.  Under the one-disease rule, a plaintiff has one cause of action arising out of asbestos exposure even if that exposure leads to multiple diseases.  Under the two-disease rule, a plaintiff has more than one cause of action arising out of asbestos exposure if that exposure leads to multiple diseases.  The rule provides a substantive right—a cause of action.  As one defendant explains, "the one-disease rule itself is not a procedural bar to a remedy where the claimant fails to commence a lawsuit within a specific period of time."  (Filing No. 302 at 5.)  And another Defendant asserts, "[t]he rule is not simply an application of [a state's] statute of limitations -- indeed, the rule would still apply to bar a second, later claim even if it was timely asserted." (Filing No. 307 at 7.)

To this point, the Court notes that Indiana has a two-year statute of limitations for product liability actions. Indiana also has a two-year statute of limitations for personal injury actions. Further, Indiana has a two-year statute of limitations for certain asbestos-related product liability actions. Kentucky, on the other hand, has a one-year statute of limitations for personal injury actions.  Under maritime law, a three-year statute of limitations applies to personal injury actions. These procedural statutes of limitations give parties guidance on when they can assert their substantive rights.  They are not the substantive right itself.

That the one-disease or two-disease rule is related to but distinct from procedural statutes of limitations is highlighted in the *Carroll* case.  In that case, the Kentucky Supreme Court considered whether a plaintiff could bring an action for lung cancer resulting from exposure to asbestos when he had been diagnosed with asbestosis many years earlier.  The court reviewed Kentucky's case law concerning the one-disease rule and then determined that the one-disease rule was not at issue in the case because the plaintiff had not filed an earlier action based on the

13

asbestosis diagnosis.  Holding to Kentucky's one-disease rule, the court explained, "[s]plitting causes of action inherently implies more than one action; nothing is split when only one action is brought."  *Carroll*, 37 S.W.3d at 700.  The court went on, "[t]his case does not turn so much on the rule against splitting causes of action, but more on pinpointing when a cause of action accrues in cases involving multiple diseases brought on by the same toxic agent."  *Id.*  The court's analysis and holding recognized the distinction between the procedural statute of limitations and the substantive one-disease rule.

The Heddens explain in their response brief that statutes of repose, unlike statutes of limitations, are substantive.  A statute of limitation bars the filing of a cause of action when a plaintiff tries to untimely file suit.  However, a statute of repose extinguishes the cause of action after passage of time thereby making the cause of action nonexistent.  *See Hinkle by Hinkle v. Henderson*, 85 F.3d 298, 301 (7th Cir. 1996); *Boggs v. Adams*, 45 F.3d 1056, 1060 (7th Cir. 1995). The one-disease rule more closely resembles a statute of repose where a plaintiff's subsequent cause of action no longer exists if it was not brought in his first lawsuit.  Under the two-disease rule, a plaintiff's subsequent cause of action will not be extinguished by a failure to bring it in the first lawsuit.

Based on these points, the Court agrees with the Defendants that the one-disease or two-disease rule is a substantive, not procedural, law. The Court now turns to the controlling substantive laws in this matter to determine whether the one-disease rule or the two-disease rule applies.

Case law concerning the one-disease or two-disease rule under maritime law is very sparse. However, the Heddens direct the Court to the case of *Nelson v. A.W. Chesterton Co.*, a relatively

recent federal multi-district litigation concerning asbestos exposure, to explain that the two-disease rule applies under maritime law.  That court noted:

> After a careful review of all the growing trend among the States to apply the two-disease rule, as well as the state and federal court decisions that have applied the two-disease rule to federal causes of action in the asbestos context, and in light of the policies served by adopting the two-disease rule, the Court concludes that the two-disease rule is the better rule.  Accordingly, the Court will adopt the two-disease rule as the applicable rule under maritime law.

*Nelson v. A.W. Chesterton Co.*, 2011 U.S. Dist. LEXIS 142970, at *11–12 (E.D. Pa. Oct. 27, 2011). After reviewing that court's review of case law, its rationale, and its decision, this Court is persuaded that the proper rule to apply under federal maritime law is the two-disease rule. Therefore, under maritime law, a plaintiff may bring an action based on a diagnosis of an asbestos-related condition and then may bring a subsequent action upon a later diagnosis of a second, distinct asbestos-related condition.  The diagnosis of the second, distinct asbestos-related condition creates a new cause of action.

Under Kentucky law, when considering a plaintiff's claims for injuries resulting from asbestos exposure, courts apply the one-disease rule.  "Kentucky has never been a 'two disease' state."  *Carroll*, 37 S.W.3d at 700.  Thus, "suits for asbestos-related claims in Kentucky may be brought only once and may encompass all current or future damages, because a claim made early can take into account damages which may occur in the future."  *Id.* at 701.

> [A] plaintiff who has been injured from asbestos exposure must make an election of how to proceed.  He may follow the *Capital Holding Corp.* path: filing suit within one year of diagnosis of his first asbestos-related disease or injury, in which case he must include any and all present and future damages from asbestos exposure or risk losing the right to pursue these damages due to the statute of limitations.  Alternatively, if his first asbestos-related injury is non-disabling and he has no reason to believe that he is likely to develop a more serious disease or injury, he may follow the *Carroll* path: waiting to sue until he develops a more serious asbestos-related disease or injury and then filing within a year of being diagnosed with this more serious disease.

*Combs v. Albert Kahn & Assocs.*, 183 S.W.3d 190, 198 (Ky. Ct. App. 2006).

As noted above, Mr. Hedden was diagnosed with asbestosis in June 1985.  Mr. Hedden then filed a complaint in Kentucky state court in 1986 against numerous defendants.  Mr. Hedden alleged that, as a result of working with asbestos products while employed by Louisville Gas & Electric, he contracted "diseases and injuries to his body system, lungs, and respiratory disorders, and the risk of mesothelioma and other cancers and injuries causing him pain, suffering and mental anguish."  (Filing No. 204-1 at 23.)  Then approximately twenty-seven years later, on August 16, 2013, Mr. Hedden was diagnosed with mesothelioma, resulting from his exposure to asbestos.  As the Heddens have conceded in their response brief,

> In the context of this matter, the Heddens' claims based upon Kim's mesothelioma would be barred in a one-disease jurisdiction because of his 1985 asbestosis diagnosis, while in a two-disease jurisdiction Kim's asbestosis and mesothelioma claims would each have their own, independent statute of limitations, and the Heddens' mesothelioma claims would be timely because they were filed less than one year after Kim's mesothelioma diagnosis.

(Filing No. 270 at 24).

Because Kentucky law applies to the Heddens' non-maritime claims and Kentucky follows the one-disease rule, the Heddens' claims for asbestos-related injuries arising out of Mr. Hedden's work at Louisville Gas & Electric are barred by the one-disease rule and the fact that Mr. Hedden brought his Kentucky state court action in 1986 for his asbestos-related injuries. Therefore, the Defendants are **GRANTED** summary judgment on the Heddens' non-maritime, state law claims. The remainder of this Order addresses the Heddens' maritime claims.

### D.   Crown Cork & Seal Company, Inc. (Filing No. 174)

Crown Cork & Seal Company, Inc. ("Crown") filed its Motion for Summary Judgment, explaining that it is entitled to summary judgment because there is no genuine dispute regarding the fact that no product or conduct of Crown was a proximate cause of Mr. Hedden's alleged

damages.  The alleged basis of Crown's liability stems from Mundet Cork Corporation's pipe and block insulation, which contained asbestos fibers.  However, Crown explains that there is no evidence that Mr. Hedden ever worked with, let alone was ever exposed to, asbestos fibers released from any Mundet product.

Crown points out that Mr. Hedden served in the Navy from April 1968 through the end of December 1969.  Crown also points out that Mr. Hedden worked at Louisville Gas & Electric for about a half a year before his service in the Navy and then from 1970 to 2001 and from 2007 to 2014.  Crown then explains its manufacturing and corporate history: Crown invented the bottle cap in 1892.  In 1963, Crown purchased the majority of the stock of Mundet, which at that time had a bottle cap division and an insulation division.  When Crown purchased Mundet's stock, it had no interest in continuing Mundet's insulation division, and just three months after the stock purchase, Crown sold the entire Mundet insulation division to Baldwin-Ehret-Hill, Inc.  At the time that Mundet merged with Crown, Mundet had ceased all insulation operations, and Crown never engaged in any manufacturing or operations associated with asbestos.  Because Crown (and its connection with Mundet) had no involvement in the asbestos industry, Crown asserts that there can be no evidence of any causation of Mr. Hedden's alleged damages attributable to Crown.

In their consolidated response brief to the summary judgment motions, the Heddens explain that "[t]he Heddens have no response to the motions filed by Crown, Cork & Seal (Doc #175) and Riley Power (Doc #203)."  (Filing No. 270 at 5.)  Because Mr. Hedden concedes to Crown's argument and he has designated no evidence regarding causation of his damages, the Court **GRANTS** Crown's Motion for Summary Judgment.

**E.**     <u>**CBS Corporation (Filing No. 179)**</u>

Defendant CBS Corporation ("CBS") explains in its summary judgment motion that there is no evidence that Mr. Hedden was exposed to asbestos attributable to CBS during his service in the Navy, and thus, the maritime claims do not pertain to CBS.  In their response brief, the Heddens explain that they "allege Westinghouse (now known as CBS Corp.) manufactured an asbestos-containing turbine used at LG&E, and Kim was exposed to this asbestos during turnaround work there."  (Filing No. 270 at 96.)  They then argue their state law claims against CBS and assert facts relevant to Mr. Hedden's employment at Louisville Gas & Electric.  The Heddens do not argue that CBS is liable for the maritime claims.  Because of the Court's ruling on the state law claims under Kentucky's one-disease rule and because the Heddens are not asserting maritime claims against CBS, summary judgment is **GRANTED** in favor of CBS.

**F.**     <u>**General Electric Company (Filing No. 180)**</u>

Concerning the Heddens' claims against General Electric Company ("GE"), in their summary judgment response brief, "[t]he Heddens allege General Electric ("GE") manufactured asbestos containing turbines used on board the USS Roosevelt and at LG&E, and that Kim was exposed to asbestos when the turbines were overhauled during his Navy service and during turnarounds at LG&E."  (Filing No. 270 at 67.)  GE responds that the Heddens have not designated any evidence to support their assertions that GE manufactured and provided asbestos-containing products on the Roosevelt.  GE also explains that its turbines were provided to the Navy without insulation, so it cannot be held liable for any asbestos-containing insulation that was added to the turbines by another entity.

In the relatively recent federal multi-district litigation concerning asbestos exposure, Judge Eduardo Robreno explained the standard for causation to establish liability in maritime asbestos cases:

> In order to establish causation for an asbestos claim under maritime law, a plaintiff must show, for each defendant, that "(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005); citing *Stark v. Armstrong World Indus., Inc.*, 21 Fed. App'x 371, 375 (6th Cir. 2001). Substantial factor causation is determined with respect to each defendant separately. *Stark*, 21 Fed. Appx. at 375.
>
> Accordingly, a mere "minimal exposure" to a defendant's product is insufficient to establish causation. *Lindstrom*, 424 F.3d at 492. "Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." *Id.* Rather, the plaintiff must show "'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Id.* (quoting *Harbour v. Armstrong World Indus., Inc.*, No. 90-1414, 1991 U.S. App. LEXIS 10867, 1991 WL 65201, at *4 (6th Cir. April 25, 1991)). The exposure must have been "actual" or "real", but the question of "substantiality" is one of degree normally best left to the factfinder.

*Nelson*, 2011 U.S. Dist. LEXIS 142970, at *12–13.

After considering state and federal case law from around the country, and based upon that case law, Judge Robreno more recently explained that "under maritime law, a manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute." *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012). This Court notes that the *Connor* decision included "distribute" as a potential source of liability.

A district court in the Northern District of Illinois decided a manufacturer's liability in an asbestos action after reviewing case law from other districts. *See Quirin v. Lorillard Tobacco Co.*, 17 F. Supp. 3d 760 (N.D. Ill. 2014). The court considered Judge Robreno's orders as well as other cases that held a manufacturer is not liable for materials it did not supply. The court also noted

19

that "[s]ome courts have concluded that a defendant is liable whenever the use of asbestos in connection with its product is foreseeable." *Id.* at 769.  The court then took a middle approach:

> [Generally, a] manufacturer is not liable for materials it did not supply.  But a duty may attach where the defendant manufactured a product that, by necessity, contained asbestos components, where the asbestos-containing material was essential to the proper functioning of the defendant's product, and where the asbestos-containing material would necessarily be replaced by other asbestos-containing material, whether supplied by the original manufacturer or someone else.

*Id.* at 769–70.

Based upon these varying standards, the Court determines that the Heddens still must show that Mr. Hedden was exposed to asbestos that in some way is attributable to GE, and GE's asbestos was a substantial factor in causing Mr. Hedden's mesothelioma.  The Heddens' argument and evidence concerning Mr. Hedden's asbestos exposure during his service in the Navy is limited to GE's turbines and the insulation that was added to those turbines.  There is no evidence that the turbines were made of anything other than metal.

Regarding the turbine insulation, the Heddens point to deposition testimony of Mr. Hedden to assert that GE required asbestos-containing insulation for its turbines and often provided that insulation with its turbines.  However, upon review of the deposition testimony designated by the Heddens and by GE, it appears that the Heddens compiled a patchwork of testimony that amounts to conjecture, guesswork, speculation, and assumptions about the insulation on GE's turbines. While some of the testimony provides greater detail based upon knowledge and not speculation, that testimony relates to Mr. Hedden's work at Louisville Gas & Electric, not his work with the Navy.  GE points to many statements by Mr. Hedden where he admits that he did not know who manufactured the insulation that was being removed from or added to the turbines. Mr. Hedden was not able to connect GE to the manufacturer or supplier of the insulation.  GE on the other hand

produced evidence, such as its interrogatory answers, that shows GE did not provide the insulation for the turbines, did not require the Navy to use particular insulation, and did not provide to the Navy any other products that contained asbestos.

The Heddens also rely on expert reports for their argument that GE should be held liable (*see* Exhibit 3, "Ewing report," and Exhibit 7 "Strauchen report"). These reports support the propositions that Mr. Hedden had significant exposure to asbestos during his long career with LG&E and during his service in the Navy, and that his exposure to asbestos led to his mesothelioma. However, there is nothing in the reports that would suggest a causal connection between GE and Mr. Hedden's asbestos exposure.

The evidence in the record shows that GE's product—a number of turbines on the Roosevelt—was not a substantial factor in causing Mr. Hedden's injury. Because the Heddens cannot show that GE's turbines were a substantial factor in causing the injury, summary judgment is appropriate because of a lack of causation. Therefore, the Court **GRANTS** GE's motion for summary judgment.

## G.    **Crane Co. (Filing No. 181)**

The Heddens assert that "Crane Co. manufactured and sold asbestos containing globe and gate valves and packing to which the Heddens allege Kim was exposed while working in the Navy and at LG&E." (Filing No. 270 at 52.)

Crane Co. counters the Heddens' allegations with deposition testimony from Mr. Hedden. Crane Co. explains that Mr. Hedden testified to seeing Crane Co. valves while aboard the Roosevelt and that he described these valves as gate and globe valves made of bronze, brass, and steel, and varying in size from half an inch to eight inches. He did not personally work on any valves, but he was in close proximity of others who were repairing and repacking the valves. Crane

Co. asserts that Mr. Hedden could not present testimony or evidence that Crane Co. manufactured or supplied any of the asbestos-containing gaskets, packing, or insulation that he may have encountered while being present during work on Crane Co. valves aboard the Roosevelt. Crane Co. also points out that the Navy often utilized gasket and packing sealing products to seal the connection points inside and between valves and piping, and these products may or may not have contained asbestos. The Navy also insulated certain valves on its ships, and this insulation material may or may not have contained asbestos.

During his deposition, Mr. Hedden testified about Crane Co. valves and their packing found on the Roosevelt.

> Q. Was a Crane valve installed or did you see the Crane valve being removed?
> A. Well, the valves that were being packing replaced, I do recall those being Crane valves.
> . . .
> Q. And do you know who manufactured the packing that was removed?
> A. I would have no way of knowing what was removed, no.
> Q. Do you know the manufacturer, brand name or trade name, of any of the packing that was replaced and installed on those valves?
> A. Some of the packaging I can remember would have been the Chesterton packing, John Crane. Well, like, Flexitallic gaskets was what I was told they were on the replaceable valves. I don't recall any others.

(Filing No. 183-1 at 40.)

Crane Co.'s corporate representative testified in his deposition that Crane Co.'s valves utilized component parts that contained asbestos, which were then in turn sold to the Navy.

> Q. In the 1960s Crane Co. sold valves to the United States Navy which contained asbestos gaskets and packing. That happened, right?
> A. If in fact the Navy specified it, yes.
> Q. But you know that it happened in the 1960s, for example?
> A. Yes.

(Filing No. 307-1 at 7.)  In Crane Co.'s discovery responses, it admits that "Crane Co. supplied valve-related parts to the USS Franklin D. Roosevelt (CVA-42).  Industrial valves manufactured

by Crane Co. were made of steel, bronze, and other metals; the valves themselves were not composed of asbestos."  (Filing No. 271-20 at 3.)  Crane Co. continues, "Certain of the valves may have had enclosed within their metal structure gaskets, packing, or discs, which may have contained some asbestos as part of their composition.  Crane Co. did not manufacture the asbestos-containing components that may have been encapsulated within the valves, but purchased them from other companies."  *Id.* at 3–4.

Mr. Hedden designated deposition testimony, explaining that he worked in close proximity to other individuals while they removed and replaced packing in Crane Co. valves and performed other work on those valves.  There was a visible, gray/off-white dust in the air when this work was performed, and Mr. Hedden inhaled this air.

As the Court noted above, a manufacturer cannot be liable for asbestos products that it did not manufacture or distribute.  *Conner*, 842 F. Supp. 2d at 801.  However, "where the defendant manufactured a product that, by necessity, contained asbestos components, where the asbestos-containing material was essential to the proper functioning of the defendant's product, and where the asbestos-containing material would necessarily be replaced by other asbestos-containing material, whether supplied by the original manufacturer or someone else," the defendant may be liable for asbestos injuries.  *Quirin*, 17 F. Supp. 3d at 769–70.

At the summary judgment stage, the Court must view the evidence in a light favorable to the Heddens as the non-moving party.  Based upon the discovery responses and corporate deposition testimony of Crane Co. and the evidence designated by Mr. Hedden concerning his work experience on the Roosevelt, there is a material factual dispute about the extent and origin of the asbestos-containing packing material within Crane Co.'s valves, which Crane Co. distributed to the Navy and to which Mr. Hedden was exposed. The Court cannot conclude at this

stage that Crane Co. is entitled to judgment as a matter of law.  Therefore, the Court **DENIES**

Crane Co.'s Motion for Summary Judgment.

**H.**      **Gardner Denver, Inc.** (**Filing No. 196**)

The Heddens allege that Mr. Hedden was exposed to asbestos from Gardner Denver pumps

on the Roosevelt and during his employment with LG&E.  They allege that Gardner Denver pumps

utilized asbestos containing gaskets and packing.

Gardner Denver responds to the Heddens' allegation by explaining that there is no evidence

that Mr. Hedden ever worked with or around any original component parts (gaskets and packing)

of Gardner Denver pumps, which could be attributable to Gardner Denver.  Mr. Hedden generally

identified Gardner Denver as one of many manufacturers of pumps on the Roosevelt.  He also

testified that he did not personally do any hands-on work on any pumps on the ship.  Further, Mr.

Hedden testified that he believed the pumps aboard the ship were installed when the ship was

constructed in the 1940s and that the component packing in the pumps would have been replaced

fairly often since the time of installation.  Gardner Denver asserts that based on this testimony, the

original components at issue (gaskets and packing) would have been replaced on several occasions

before Mr. Hedden boarded the Roosevelt in May 1968. Thus, Gardner Denver explains, the

Heddens have produced no evidence to show that Mr. Hedden was exposed to original component

parts associated with Gardner Denver pumps during his time in the Navy.

The Heddens point to deposition testimony to counter Gardner Denver's argument.

However, each portion of deposition testimony either relates to Mr. Hedden's work at LG&E or

discusses DeLaval pumps, not Gardner Denver pumps.  While other deposition testimony broadly

claims that answers would be similar as they relate to other pumps on the ship, none of the

testimony specifies Gardner Denver.  Additionally, the deposition testimony does not connect any

24

specific asbestos-containing component parts with Gardner Denver pumps.  The Heddens' response to Gardner Denver is similar to its response to GE; they fail to establish a causal connection between Mr. Hedden's injuries and any product that can attributable to Gardner Denver.  The bare fact that Gardner Denver pumps were present somewhere on the Roosevelt is insufficient.

The evidence in the record shows that Gardner Denver's product—unidentified pumps on the Roosevelt—was not a substantial factor in causing Mr. Hedden's injury.  Because the Heddens cannot show that Gardner Denver's pumps were a substantial factor in causing the injury, summary judgment is appropriate because of a lack of causation.  Therefore, the Court **GRANTS** Gardner Denver's motion for summary judgment.

I.      **John Crane Inc. (Filing No. 198)**

The Heddens assert that Mr. Hedden was "exposed to asbestos from John Crane, Inc. (not to be confused with Crane Co., a separate entity) gaskets and packing used while he was in the Navy and working at LG&E." (Filing No. 270 at 80.)  John Crane, Inc. asserts that it is entitled to summary judgment because there is insufficient evidence to show that Mr. Hedden was exposed to John Crane products with asbestos, leading to Mr. Hedden's mesothelioma.  John Crane asserts that the evidence shows there were many gaskets and packing onboard the Roosevelt, and these gaskets and packing were manufactured by many companies, including John Crane.  It claims that the Heddens cannot distinguish among the various companies that provided gaskets and packing for the Roosevelt which of those companies' products caused Mr. Hedden's injuries. John Crane also points out that Mr. Hedden did not personally perform any hands-on work with gaskets and packing on the Roosevelt.  John Crane notes that Mr. Hedden's expert reports do not identify John Crane as a cause of his mesothelioma.

Responding to John Crane's summary judgment motion, the Heddens point to various expert reports, not to tie John Crane specifically to the injuries, but rather to show that Mr. Hedden's asbestos exposure from gaskets and packing was significant, and his asbestos exposure caused his mesothelioma.  It appears the very purpose of the expert reports is to show that Mr. Hedden had significant exposure to asbestos during his career with the Navy and LG&E and that his exposure to asbestos led to his mesothelioma, not to establish a causal connection between any particular defendant and Mr. Hedden's asbestos exposure.

The Heddens also direct the Court to deposition testimony that indicates Mr. Hedden worked in close proximity to other individuals as they removed and replaced John Crane gaskets on the Roosevelt.  Mr. Hedden described the packaging of the John Crane gaskets, and he recalled John Crane's name printed on the gasket material.  He recalled associating the greyish color of the gaskets with its asbestos nature.  The Heddens designated testimony showing Mr. Hedden was working in areas of the ship while others were scraping and chipping away gaskets.  This work created dust, which Mr. Hedden inhaled.

The Court must view the evidence in a light favorable to the Heddens as the non-moving party when deciding this summary judgment motion.  Based upon the designated evidence of Mr. Hedden's work experience on the Roosevelt, there is a material factual dispute about the extent of Mr. Hedden's asbestos exposure from John Crane's gaskets.  The Court cannot conclude at this stage of the litigation that John Crane is entitled to judgment as a matter of law.  Therefore, the Court **DENIES** John Crane's Motion for Summary Judgment.

**J.      Link-Belt Construction Equipment Company (Filing No. 200)**

The Heddens' claims against Link-Belt Construction Equipment Company ("Link-Belt") relate solely to Mr. Hedden's exposure to asbestos during his employment with Louisville Gas &

Electric. The Heddens did not assert maritime claims against Link-Belt.  Because of the Court's ruling on the state law claims under Kentucky's one-disease rule and because the Heddens did not assert maritime claims against Link-Belt, summary judgment is **GRANTED** in favor of Link-Belt.

**K.**     **Riley Power, Inc. ([Filing No. 202](#))**

Riley Power, Inc. ("Riley") filed its Motion for Summary Judgment, explaining that it is entitled to summary judgment because there is no genuine dispute that no Riley product was a proximate cause of Mr. Hedden's alleged damages.

Riley explains that Mr. Hedden worked at Louisville Gas & Electric for about a half a year before his service in the Navy and then from 1970 to 2001 and from 2007 to 2014.  Riley's only connection to Louisville Gas & Electric is a boiler it provided to Louisville Gas & Electric at the Cane Run facility.  There were six boilers at the Cane Run facility.  All six boilers were located in one building, and only Unit Five was provided by Riley.  The evidence shows that Mr. Hedden worked on Unit Five sometime in the early 1970s while he was employed as an insulator helper and an insulator.  He worked on Unit Five more than two times but less than ten times.

Pursuant to a contract, Riley designed and engineered the boiler that was constructed as Unit Five at LG&E's Cane Run facility in 1964.  After the contract had been entered, Riley's contractual obligation to supply insulation for Unit Five was expressly withdrawn from the contract by LG&E.  Furthermore, Riley's contract with LG&E did not specify or require the use of asbestos-containing insulation on its boiler.  Because of the contract modification, Riley did not supply or install the insulation that was used in the construction of Unit Five at Cane Run.  Consequently, Riley asserts, Mr. Hedden cannot establish that he was exposed to any asbestos-containing products for which Riley can be held liable.  Riley further asserts that Mr. Hedden cannot provide any evidence as to the manufacturer of any insulation that was used with the Riley

boiler at Cane Run or the actual composition of any such insulation, including whether it actually contained asbestos.  Because Riley did not supply or install the insulation used on its boiler at LG&E and it cannot be held liable for another manufacturer's product applied to its boiler without Riley's involvement, summary judgment should be granted to Riley.

Like Mr. Hedden's response to Crown's summary judgment motion, in the consolidated response brief, the Heddens explain that "[t]he Heddens have no response to the motions filed by Crown, Cork & Seal (Doc #175) and Riley Power (Doc #203)." (Filing No. 270 at 5.) Because Mr. Hedden concedes to Riley's argument and evidence regarding a complete lack of any evidence of causation of Mr. Hedden's damages, the Court **GRANTS** Riley's Motion for Summary Judgment.

## L.   Mrs. Hedden's Loss of Consortium Claim

"[L]oss of consortium claims are derivative from the spouse's underlying claim, in that, if the underlying claim cannot be proven, then the loss of consortium claim fails." *Remmers v. Remington Hotel Corp.*, 56 F. Supp. 2d 1046, 1058 (S.D. Ind. 1999).  Therefore, to the extent this Order dismisses claims against certain defendants, Mrs. Hedden's loss of consortium claim fails. To the extent that claims against certain defendants remain pending, so too Mrs. Hedden's loss of consortium claim remains.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Crown Cork & Seal Company, Inc. (Filing No. 174), CBS Corporation (Filing No. 179), General Electric Company (Filing No. 180), Gardner Denver, Inc. (Filing No. 196), Link-Belt Construction Equipment Company (Filing No. 200), and Riley Power, Inc's. (Filing No. 202) Motions for Summary Judgment are **GRANTED**.

Defendants Crane Co. (Filing No. 181) and John Crane, Inc's. (Filing No. 198) Motions for Summary Judgment are **GRANTED in part and DENIED in part**. The maritime claims associated with asbestos exposure during Mr. Hedden's service in the Navy, and Mrs. Hedden's derivative claim for loss of consortium, remain pending for trial against Crane Co. and John Crane, Inc. The non-maritime claims associated with asbestos exposure during Mr. Hedden's employment at Louisville Gas & Electric are dismissed.

The new trial date will be scheduled in a separate Entry. The parties are instructed to contact the Magistrate Judge regarding revised case management deadlines.

**SO ORDERED.**

Date: 9/30/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ashleigh M. Resetarits
GEORGE & FARINAS, LLP
ar@georgeandfarinas.com

Kathleen A. Musgrave Farinas
GEORGE & FARINAS, LLP
kf@georgeandfarinas.com

Linda S. George
GEORGE & FARINAS, LLP
lg@lgkflaw.com

Todd Christopher Barnes
GEORGE & FARINAS, LLP
tb@georgeandfarinas.com

Christopher N. Wahl
HILL FULWIDER, P.C.
chris@hfmfm.com

David J. Saferight
HILL FULWIDER, P.C.
david@hillfulwider.com

Douglas B. King
WOODEN & MCLAUGHLIN LLP
Doug.King@WoodenMcLaughlin.com

Erica Kay Drew
WOODEN & MCLAUGHLIN LLP
Erica.Drew@WoodenMcLaughlin.com

Kip S.M. McDonald
WOODEN & MCLAUGHLIN LLP
Kip.McDonald@WoodenMcLaughlin.com

Travis R. Smith
WOODEN & MCLAUGHLIN LLP
tsmith@woodmclaw.com

Jill Marie Felkins
SEGAL MCCAMBRIDGE SINGER &
MAHONEY
jfelkins@smsm.com

Jason Lorne Kennedy
MCCAMBRIDGE SINGER & MAHONEY
jkennedy@smsm.com

McRay Judge, II
SWANSON MARTIN & BELL, LLP
mjudge@smbtrials.com

Michelle M. Wahl
SWANSON MARTIN & BELL, LLP
mwahl@smbtrials.com

Reginald B. Bishop
ROBERTS & BISHOP
rbishop@roberts-bishop.com